Lee A. Greenwood
David Zetlin-Jones
Heather L. Shaffer
Ming Ming Yang
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
(212) 336-0978 (Zetlin-Jones)
ZetlinJonesJ@sec.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br>                 Plaintiff, <br><br>       -against- <br><br> JORDAN CHIRICO, <br><br>               Defendant. | **COMPLAINT** <br><br> 25 Civ. 6715 (    ) <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant Jordan Chirico ("Chirico"), alleges as follows:

## SUMMARY

1.  From at least April 2022 through June 2024, Defendant Chirico, a portfolio manager employed by registered investment adviser Leucadia Asset Management LLC ("Leucadia"), violated his fiduciary duty to his private investment fund client, the 3|5|2 Capital ABS Master Fund, LP ("352 Fund" or "Fund") in at least two ways.  *First*, Chirico violated his duty of loyalty to the 352 Fund by directing that the Fund enter into conflicted investments in notes issued by Water Station Management LLC ("Water Station" or the "Company"), which were purportedly collateralized by water vending machines owned by the Company ("Water Station Notes" or "Notes").  Chirico

invested the 352 Fund's assets in the Notes without disclosing to Leucadia or the 352 Fund that he had a significant personal investment in Water Station, that he orchestrated the buyout of his own investment with Notes offering proceeds, and that he continued to extend, and receive payment on, millions of dollars of personal loans to Water Station's founder, owner, and managing partner, Ryan Wear ("Wear"). *Second*, by at least August 2023, Chirico had notice of red flags indicating that at least a portion of the purported collateral for the Notes may have been fabricated. In the face of these red flags, Chirico failed to act in the 352 Fund's best interests by causing the Fund to substantially increase its investments in Water Station Notes, while continuing to conceal his personal financial entanglements with Water Station and Wear from Leucadia and the Fund.

2.      Water Station was in the business of selling and servicing water vending machines ("water machines"). From 2018 to 2021, Chirico personally invested more than $7 million in water machines purportedly sold and serviced by Water Station or its affiliates. In connection with these investments, Chirico received nearly $3 million in distributions from Water Station. Chirico also received approximately $1.5 million in "referral fees" from Water Station for recommending friends, family members, and business associates who invested in the Company during the same period.

3.      Beginning in late 2021, Chirico worked with Water Station's owner, Wear, to coordinate Water Station's issuance and sale of the Water Station Notes. Upon the closing of the first Notes issuance in April 2022, Chirico directed his advisory client, the 352 Fund, to invest nearly $9 million in the Notes. Between April 2022 and February 2024, Chirico grew the 352 Fund's position in the Notes to more than $90 million. At no point during that period did Chirico, as investment adviser to the 352 Fund, disclose to either Leucadia or the Fund that he was personally invested in the very same business in which he had invested his client.

4. Nor did Chirico disclose numerous other personal financial dealings with Wear and Wear's companies including (a) Chirico's sale, in November 2022, of his water machine investments to a Wear-controlled entity, which the Wear entity paid for using proceeds of the Notes offering; (b) Chirico's entry into a promissory note transaction with Wear, also in November 2022, under which Wear was obligated to repay Chirico $1.9 million over the following 18 months; and (c) Chirico's extension of $1.45 million more in personal loans to Wear over the course of 2023.

5. By at least the fall of 2023, the Water Station Notes' "Collateral Manager"—a financial firm tasked with independently monitoring the performance of the assets backing the Notes—notified Chirico that Water Station's representations to it regarding the number and existence of the water machines purportedly securing the Notes appeared inaccurate. Chirico also became aware of significant cash shortfalls that left Water Station behind on the money it owed to other investors and posed a growing risk that Water Station would be unable to meet its repayment obligations under the Notes.

6. Despite this knowledge, Chirico *increased* the 352 Fund's investments in Water Station Notes from $12.9 million in August 2023 (when he learned of the Collateral Manager's concerns) to more than $90 million by February 2024, while continuing to conceal his personal financial relationships with Water Station and Wear from Leucadia and the Fund. During this period, Chirico pressured Wear to use available cash to make payments to Chirico and the friends, family, and business associates Chirico had referred to Water Station as investors, thereby depriving Water Station of cash it needed to meet its obligations to the 352 Fund.

7. In August 2024, Water Station entered receivership and was forced into involuntary Chapter 11 bankruptcy proceedings in the wake of revelations that Wear had engaged in a fraudulent Ponzi-like scheme in connection with his operation of Water Station and the sale of Water Station Notes. Water Station's collapse decimated the value of the 352 Fund's Notes investments.

## VIOLATIONS

8.      By virtue of the foregoing conduct and as alleged further herein, Chirico has violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), (2)].

9.      Unless Chirico is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10.     The Commission brings this action pursuant to the authority conferred upon it by Advisers Act Section 209(d) and 209(e) [15 U.S.C. § 80b-9(d) and 80b-9(e)].

11.     The Commission seeks a final judgment: (a) permanently enjoining Chirico from violating the federal securities laws this Complaint alleges he has violated; (b) ordering Chirico to disgorge all ill-gotten gains he received as a result of the violations alleged here and to pay prejudgment interest thereon; (c) ordering Chirico to pay a civil money penalty pursuant to Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)]; (d) permanently restraining and enjoining Chirico from, directly or indirectly, acting as or being associated with any investment adviser, broker, or dealer; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to Advisers Act Section 214 [15 U.S.C. § 80b-14].

13.     Chirico, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

14.     Venue lies in this District under Advisers Act Section 214 [15 U.S.C. § 80b-14]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District.  Among other things, Leucadia's principal place of business is in New York, New York, and the 352 Fund effected its transactions in Water Station Notes, including the execution of the indentures and note purchase agreements, there.

## DEFENDANT

15.     **Chirico**, age 41, is a resident of Carmel, Indiana.  From May 28, 2020, through June 5, 2024, Chirico was employed by Leucadia as the portfolio manager of the 352 Fund.  Before joining Leucadia, Chirico was registered with the Financial Industry Regulatory Authority in connection with his employment by four broker-dealer firms between 2006 and 2020 and, before that, played soccer professionally.

## OTHER RELEVANT INDIVIDUALS AND ENTITIES

16.     **Leucadia** is a Delaware limited liability company with its principal place of business in New York, New York, and is a wholly owned subsidiary of the Jefferies Financial Group Inc. ("Jefferies").  Leucadia has been registered with the Commission as an investment adviser since January 2003.  Leucadia provides investment advisory and portfolio management services to private investment funds and separately managed accounts.  Leucadia managed the 352 Fund and employed Chirico as the portfolio manager for the 352 Fund.

17.     The **352 Fund** is a private fund established by Leucadia in 2021 that invested in asset-backed securities, loans, and other financial instruments.  As of December 31, 2023, Leucadia's 3|5|2 Capital Division ("352 Capital Division"), of which the 352 Fund was a part, had approximately $641 million in assets under management.  Leucadia began to wind down the 352 Capital Division and the 352 Fund in July 2024 after revelations of Water Station's alleged fraud and the collapse of the 352 Fund's investments in Water Station Notes.

18.     **Wear**, age 49, is a resident of Marysville, Washington.  Wear is the founder and owner and, until August 2024, was the managing partner of Water Station and Creative Technologies, LLC ("Creative").  Wear owns and controls dozens of other limited liability companies, some of which are related to Wear's water and other vending machine businesses.

19.     **Water Station** is a Washington limited liability company formed by Wear in 2016.  Water Station was formerly controlled and remains wholly-owned by Wear.  Water Station placed, installed, operated, and serviced water machines, which were generally manufactured or sourced by Creative.  In August 2024, Water Station was put into receivership through a private litigation in Washington state court, captioned *First Fed Bank v. Creative Technologies, LLC*, Case No. 24-2-10753-3 SEA (Wa. Super. Ct.) (filed May 14, 2024) (the "Receivership Action").  Later that month, a creditor of Water Station filed an involuntary Chapter 11 bankruptcy petition against it, captioned *Water Station Management LLC*, No. 24-bk-1864 (Bankr. E.D. Wa.) (filed Aug. 27, 2024) (transferred from Bankr. S.D. Tex.).  Water Station is now managed by an independent chief restructuring officer.

20.     **Creative** is a Washington limited liability company formed by Wear in 2013.  Creative was formerly controlled and remains majority-owned by Wear.  Creative manufactured, sourced, and sold water machines that Water Station placed and serviced around the country.  In May 2024, Creative was put into receivership through the Receivership Action.  In August 2024, a creditor of Creative filed an involuntary Chapter 11 bankruptcy petition against it, captioned *Creative Technologies, LLC*, No. 24-bk-1866 (Bankr. E.D. Wa.) (filed Aug. 27, 2024) (transferred from Bankr. S. D. Tex.).  Creative is now managed by an independent chief restructuring officer.

## FACTS

### I.    CHIRICO PERSONALLY INVESTS IN WATER STATION.

#### A.    Water Station's Investment Opportunity

21.    Beginning in at least 2016, Wear raised money for Water Station and Creative from outside investors through the issuance of investment contracts tied to water machines.

22.    Under these investment contracts, investors paid Creative a fixed price to purchase particular water machines, which Water Station agreed to install and service at retail locations such as gas stations, grocery stores, and fitness centers.

23.    The investment contracts generally consisted of (a) a purchase order, pursuant to which investors would pay Creative a fixed price (typically $8,500 per machine though sometimes as much as $10,000) to become the "sole owner and title holder" of specified water machines; (b) a service agreement, pursuant to which Water Station agreed to place and install the investor's water machines at locations within its network of retailers, to collect cash and other payments from the machines, and to manage all day-to-day decisions concerning the machines in return for a monthly servicing fee based on the machine's profits; and (c) for certain investors, a franchise agreement, pursuant to which WST Franchise Systems LLC ("WST"), a Water Station affiliate, licensed its business model and trademark to investors in return for an additional fee.

24.    Pursuant to its service agreements, Water Station promised investors steady returns through monthly distributions.

#### B.    Chirico Purchases Water Station Securities.

25.    By early 2018, Chirico had been in the financial services industry for over a decade, having worked in well-paid positions across multiple financial firms, including registered broker

dealers and investment advisers. Chirico's focus was on trading and managing portfolios of asset-backed instruments.

26.     In or around early 2018, Chirico began researching Water Station as a potential personal investment opportunity. As part of his due diligence, Chirico had multiple telephone conversations with Wear to get a better understanding of Water Station and its business model.

27.     In February 2018, Chirico formed C3 Capital, Inc. ("C3"), an Indiana corporation he owned jointly with his spouse, for the purpose of purchasing and holding his Water Station investments.

28.     In June 2018, Chirico, on behalf of C3, executed a purchase order with Creative to acquire 350 water machines for $2.875 million. The purchase order stated that C3 had paid an initial deposit of $100,000, entitling it to ownership of 11 water machines, and that it would pay the remaining amount upon the funding of a bank loan, after which it would own all 350 machines.

29.     Chirico, on behalf of C3, simultaneously entered into a service agreement with Water Station, pursuant to which Water Station agreed to install and service C3's water machines and to pay C3 monthly distributions of 50% of the net profits generated by C3's machines.

30.     Chirico negotiated the purchase order and service agreement with Wear, who signed the documents on behalf of Creative and Water Station, respectively.

31.     Chirico began receiving monthly distributions from his Water Station investment in August 2018.

32.     Chirico was approved for a bank loan in September 2018, which enabled him to purchase the additional 339 water machines contemplated in the purchase order described in paragraph 28 above.

33.     Upon the funding of the loan, Chirico remitted the balance of his $2.875 million initial Water Station investment.

34.     Also in September 2018, Chirico, on behalf of C3, executed a franchise agreement with WST, pursuant to which WST licensed its trademark and business model to Chirico in exchange for a franchise fee.

35.     In March 2019, after his water machines failed to generate the level of returns Chirico had expected, Chirico approached Wear to renegotiate the terms of his service agreement.

36.     Under an amended service agreement, rather than base C3's investment returns on C3's variable share of its water machines' monthly net profits, Water Station (through Wear) agreed to pay C3 fixed monthly distributions based on an annual rate of return of 15% of the amount of C3's Water Station investment.

37.     Between late 2018 and early 2019, Wear engaged Chirico to assist in identifying and procuring potential financing opportunities to grow Water Station's water machine business.  In exchange, Wear promised Chirico a referral fee based upon the value of any financing ultimately secured.

38.     In early 2019, Chirico and representatives from an international financial institution conducted a site visit at Water Station's offices and warehouses in Washington.  The financial institution put together a term sheet for a transaction that would have advanced approximately $50 million to fund Water Station's expansion, but Wear ultimately rejected the deal.

39.     In March 2020, Chirico, acting on behalf of C3 and relying on funding from another bank loan, executed a purchase order to acquire an additional 300 water machines for $2.55 million, again with a service agreement providing for an annual return of 15% of C3's investment to be paid monthly.

40.     In July 2021, Chirico, on behalf of C3, executed an additional purchase order and service agreement with Creative and Water Station, purchasing an additional 29 water machines for $246,500.

41.     In August 2021, Chirico, on behalf of C3, executed an additional purchase order and service agreement with Creative and Water Station to purchase an additional 175 water machines for $1.4875 million.

42.     As was the case with his prior investments, Water Station promised a fixed 15% annualized rate of return on each of these new investments to be paid monthly.

43.     These additional purchases brought Chirico's total investment in Water Station to approximately $7.3 million and 854 water machines, making him one of the Company's largest individual investors.

44.     In addition to his direct investments in Water Station machines, Chirico also received compensation from Wear and Water Station through referral fees for recommending friends, family members, and business associates to make their own investments in Water Station.

45.     Wear promised Chirico and Individual A, a mutual friend of Chirico's and Wear's who had extensive business dealings and investments with Wear and Water Station, a 12% finder's fee for any investment they brought into Water Station.  Chirico and Individual A agreed to split any such referral fees they earned equally between themselves.

46.     From approximately 2018 through 2021, Chirico and Individual A referred at least twenty friends, family members, and business associates to invest in Water Station, at least eight of whom were referrals made by Chirico personally.

47.     Between 2018 and 2022, Water Station and/or Creative paid Chirico a total of approximately $1.5 million for these referrals.

## II.     CHIRICO JOINS LEUCADIA.

### A.     Leucadia Recruits Chirico to Launch the 352 Capital Division.

48.     In May 2020, Leucadia recruited Chirico as part of Leucadia's effort to move into a new investment strategy focused on asset-backed securities.

49.     Following Chirico's hiring, Leucadia established the 352 Capital Division to offer advisory and portfolio management services to clients through separately managed accounts and private funds, with an emphasis on investments in consumer-oriented asset-backed securities.

50.     In or around September 2020, Leucadia appointed Chirico to be the portfolio manager and managing director of the 352 Capital Division, which Chirico named after a soccer formation.

51.     Under Chirico's employment agreement, Leucadia delegated to Chirico the authority to "make appropriate investment decisions (subject to any agreed-to risk limits or guidelines)" on behalf of the 352 Capital Division.

52.     In this capacity, Chirico provided investment advice to, among other clients, the 352 Fund, a private fund whose stated investment objectives were to "generate attractive risk-adjusted returns primarily in the cash securitized market" by "structur[ing] a portfolio of asset-backed securities, loans and other financial instruments . . .  to enhance long-term return goals."

53.     Chirico was the senior-most member of a small team managing the 352 Fund's investment portfolio and, at all relevant times, had the authority to make unilateral investment decisions on the Fund's behalf.

54.     Chirico was the only investment professional identified in 352 Fund's private placement memorandum as providing investment advice to the Fund.

55.     The private placement memorandum also disclosed the 352 Fund's "Dependence Upon the Portfolio Manager [Chirico]" as a risk factor, noting that the Fund was especially dependent on Chirico's "skill, judgment and expertise."

56.     Chirico received a base annual salary and cash bonuses for his work providing investment advice to Leucadia clients, including the 352 Fund.

57. Over the course of his employment at Leucadia, from May 2020 until his termination in June 2024, Chirico was paid more than $5.3 million in salary and bonus payments.

58. As a portfolio manager at Leucadia, Chirico had unilateral discretion to make investment decisions on behalf of certain Leucadia advisory clients (such as the 352 Fund) and engaged in the business of advising Leucadia clients on the advisability of investing in securities, for which he received compensation.

59. Accordingly, Chirico was at all relevant times an investment adviser under the Advisers Act Section 202(a)(11) [15 U.S.C. § 80b-2(a)(11)].

**B.    Chirico's Duties as an Investment Adviser**

60. As an investment adviser, Chirico owed his investment advisory clients (including the 352 Fund) a fiduciary duty to act in their best interests, which includes of a duty of loyalty and a duty of care.

61. Chirico's duty of loyalty required that he act with the utmost good faith, and make full and fair disclosure of all material facts and employ reasonable care to avoid misleading clients. The duty to disclose all material facts includes the duty to disclose all conflicts of interest that might incentivize the adviser to render investment advice that is not disinterested.  To satisfy the duty of loyalty, an investment adviser who does not eliminate a conflict of interest with his or her advisory client must make an adequate disclosure of such conflicts of interest to the client and obtain the client's informed consent to the conflict.

62. The duty of care includes the duty to provide advice that is in the best interest of the client, based on the client's objectives, and to provide advice and monitoring over the course of the advisory relationship.

63. Jefferies adopted and implemented policies, procedures, and practices to assure it and its employees adhered to their fiduciary obligations generally, and to identify, monitor, and

12

mitigate employee conflicts of interest specifically.  These policies, procedures, and practices were applicable to Leucadia employees, including Chirico.

64.    For example, Jefferies' Employee Outside Activities and Affiliations Policy ("OBA Policy") required employees, including Leucadia employees, to complete and submit an Outside Affiliation Request Form to Jefferies' compliance department ("Compliance Department") for approval prior to engaging in a business activity with an outside organization or entity (an "Outside Business Activity").

65.    Per the OBA Policy, in determining whether to approve an employee's participation in an Outside Business Activity, the Compliance Department would consider, among other things, whether the activity conflicted with, or appeared to conflict with, either the firm's or its clients' interests or posed a reputational risk.

66.    Under the OBA Policy, employees were required to certify annually to the Compliance Department that they had received approval of all Outside Business Activities. Employees were also required to report immediately to the Compliance Department any material changes to their Outside Business Activities and/or if they identified any new actual or potential conflicts arising from any previously-approved Outside Business Activities.

67.    Jefferies' Personal Trading and Private Securities Transactions/Investments Policy ("Personal Trading Policy") required employees, including Leucadia employees, to complete and submit an online trade request through a Jefferies web-based system for approval before executing any personal trade or private securities transactions in their personal trading accounts, including before adding to or withdrawing from any previously-approved investment.  The Personal Trading Policy defined "private securities" to include "non-publicly traded financial instruments and securities and investments in private businesses, corporations and partnerships, including passive investments in investment partnerships and funds."  The Personal Trading Policy also warned that

"[e]mployees must be extremely careful to avoid conflicts of interest as well as the appearance of a conflict of interest," noting that a conflict "exists when an employee's personal interests, financial or otherwise, are inconsistent with the interests of the [Jefferies] or its customers."

68.    Jefferies' Investment Advisers Code of Ethics ("Code of Ethics") was applicable to a subset of Jefferies' and Leucadia's employees, including those "who provide investment advice on behalf of the Adviser and are subject to the supervision and control of the Adviser."  The Code of Ethics provided that all persons covered by the policy "are fiduciaries to [their] advisory clients" and, as such, "owe their clients (i) a duty of care to serve the best interests of clients and (ii) a duty of loyalty which requires an advisor not subordinate its clients' interests to its own interests, and to eliminate or expose through full and fair disclosure conflicts of interest."

69.    The Code of Ethics further required employees "involved in making securities recommendations to advisory clients" (as Chirico was) to submit at least annually to the Compliance Department a list of all "reportable securities," defined to include any "participation in any profit-sharing agreement" and any "investment contract" held by any covered employee.

70.    Leucadia's marketing brochure, filed with the Commission in its Form ADV, highlighted the applicability of the Code of Ethics to Leucadia's employees, informing potential investors that the Code of Ethics implements the principle that "the professional activities and personal investment activities of our personnel must … avoid any actual, potential or the appearance of a conflict between the interest of our clients and those of our firm or our personnel."

71.    As an employee of Leucadia, and by virtue of his duties as portfolio manager and managing director of the 352 Capital Division, Chirico was subject to each of the above-described codes and policies and their various reporting requirements.

72.     Chirico was required to certify annually that he reviewed and understood the above-described codes and policies, had adhered to their requirements, and had made all disclosures required under them.

73.     Chirico completed and submitted these annual compliance certifications each year from 2020 through 2023.

## III.     CHIRICO'S UNDISCLOSED CONFLICTS OF INTEREST

### A.     Chirico's Concealment of His Water Station Investments

74.     When Chirico joined Leucadia in May 2020, he had already personally invested approximately $5.2 million in Water Station securities through C3.

75.     In August 2020, upon joining Leucadia, Chirico submitted a "New Hire Questionnaire" to the Compliance Department.

76.     In his New Hire Questionnaire, Chirico attested that he had read, and was in compliance with, Jefferies' compliance policies and procedures, including the Codes of Ethics, OBA Policy, and Personal Trading Policy.

77.     Despite his more than $5 million Water Station investment, Chirico falsely represented in his New Hire Questionnaire that he did not have any private securities transactions and/or Outside Business Activities or affiliations to disclose.

78.     In December 2020, Chirico submitted an Outside Affiliation Request Form in which he disclosed his ownership of C3 as an Outside Business Activity.

79.     In this request, Chirico described C3's business as an "[i]nvestment in Water related vending Machines within retail establishments," and stated that his role with the company entailed a "passive investment in the vending equipment that distributes water in grocery and other retail settings [to] be owned by my wife and I."

80.     Chirico stated in this disclosure that C3 was neither "investment-related" nor "in his coverage sector industry," and he certified that, to the best of his knowledge, he was unaware of any conflicts or potential conflicts of interest between C3's interests and Leucadia's or its clients.

81.     Nowhere in this December 2020 request did Chirico identify Water Station by name, or otherwise specify that the vending machine products he had invested in through C3 were affiliated with Water Station and/or Creative.

82.     By contrast, when Chirico submitted requests to pre-clear other private investments over the course of 2021 and 2022, he identified by name the companies in which he was investing.

83.     While employed at Leucadia, Chirico made an additional investment of more than $2 million in Water Station securities in July and August 2021.

84.     Chirico did not disclose these additional investments as private securities transactions or reportable holdings to the Compliance Department or to his supervisors at Leucadia. Nor did Chirico update his Outside Business Activity disclosure to reflect this additional investment activity.

**B.     Chirico Directs the 352 Fund to Invest in Water Station Notes.**

85.     In the fall of 2021, Chirico began working with Water Station and Wear on a debt issuance to allow Water Station to raise more capital for the manufacture and acquisition of additional water machines.

86.     Chirico introduced Wear to contacts within his network of business associates to assist Water Station in structuring the deal, including outside securities counsel and principals at a registered broker-dealer who might serve as placement agent for any securities offering.

87.     Over the course of the next several months, Water Station worked to structure an offering of Water Station Notes, ultimately by retaining the broker-dealer Chirico recommended to market and place the Notes with institutional investors.

88.     On April 29, 2022, Water Station issued the Notes, which consisted of Class A Notes in the aggregate principal amount of $56.25 million and Class B Notes in the aggregate principal amount of $15 million, under an indenture ("Indenture").

89.     Under the Indenture, these Water Station Notes were to be secured by 2,794 water machines that Water Station pledged upon the Notes' issuance, as well as new or existing water machines (less than five years old) to be purchased from prior Water Station investors with Notes proceeds ("Eligible Assets"). Subject to limited and specified one-time exceptions applicable to the initial funding, Water Station was prohibited from withdrawing Notes proceeds for any purpose other than to acquire Eligible Assets. The revenues generated by water machines securing the Notes were to be used to make interest and principal payments to the noteholders.

90.     The Indenture appointed an affiliate of the placement agent (the broker-dealer Chirico introduced to Wear) as the Notes' Collateral Manager. Among other things, the Collateral Manager was responsible for reviewing (a) documentation prepared by Water Station (including sales agreements and invoices) to confirm that Notes proceeds were being used solely for their authorized use of purchasing Eligible Assets; and (b) periodic financial and performance reporting relating to the Eligible Assets securing the Notes (also prepared by Water Station) to assure that the Notes were sufficiently collateralized.

91.     Institutional Investor A, a financial services company focused on community banking, purchased the entirety of the Class A Notes for $55.7 million.

92.     Chirico directed the 352 Fund and a Jefferies affiliate to purchase the entirety of the Class B Notes, committing approximately $8.9 million of the Fund's assets and an additional approximately $6.1 million from the Jefferies affiliate to fund the investment.

93.    At the time he caused the 352 Fund to make this initial investment in Water Station Notes, Chirico knew he and his spouse (through C3) had personally invested more than $7 million in water machines serviced by Water Station.

94.    Chirico had also received by this point more than $2 million in distributions from his Water Station investments (and stood to receive additional distributions) as well as more than $1.5 million in referral fees for bringing to Water Station the investments of his friends, family, and business associates.

95.    Chirico therefore knew that he was committing his client's assets to an issuer in whose financial viability he had a personal financial interest.

96.    Chirico knew, recklessly disregarded, or should have known that his personal financial interest in Water Station presented a conflict of interest with that of his advisory client fund, and that his recommendation that the 352 Fund invest in Water Station alongside him was not disinterested.

97.    Chirico also knew, recklessly disregarded, or should have known that he failed to provide full and fair disclosure of this conflict and to obtain his client's informed consent before investing his client's assets in Water Station.

98.    Chirico never disclosed his personal financial interest in Water Station to the 352 Fund, to his supervisors at Leucadia, or to the Compliance Department before directing the Fund to invest in Water Station Notes.

99.    Nor did Chirico update his 2020 Outside Affiliation Request Form to clarify or specify that the investment in water machines that he held through C3 was in the same issuer into which he directed the 352 Fund to invest.

100.    To the contrary, Chirico falsely affirmed to the Compliance Department in annual compliance certifications each calendar year from 2021 through 2023 that he had no additional

18

information to report concerning his Outside Business Activities, while also certifying that he understood his "ongoing requirement to advise Compliance promptly, if any Outside Activities that I have either already disclosed or disclose in the future, change materially, or if I identify any new potential conflicts."

### C.    Chirico's Ongoing Undisclosed Conflicts of Interest

101.    Over the summer and fall of 2022, after the closing of the initial Water Station Notes offering, Chirico and Wear discussed having Water Station repurchase C3's water machines.

102.    While these negotiations were ongoing, Leucadia's chief operating officer ("Leucadia COO") inquired further about the nature of C3, Chirico's disclosed Outside Business Activity.

103.    In an email to the Leucadia COO on October 11, 2022, responding to this inquiry, Chirico again declined to identify Water Station by name.  Chirico stated only that he played a strictly "passive role" in C3's operations, which involved an external investment in "vending" assets that were "unrelated to debt/equity markets."

104.    Chirco's October 11, 2022 email to the Leucadia COO was misleading because (a) far from playing a merely "passive" role in C3, Chirico at the time was actively negotiating a buyout of his investment with Wear and Water Station; and (b) by stating that his investment was "unrelated to debt/equity markets," Chirico concealed that the investment was in a company whose debt the 352 Fund held.

105.    Chirico and Wear ultimately effectuated the buyout of Chirico's water machines through a series of transactions culminating in a share purchase agreement dated November 15, 2022, between C3 and Creative.  Pursuant to this agreement, Creative purchased all of C3's shares for approximately $7.3 million, about the same amount that Chirico and his spouse had invested (through C3) in Water Station between 2018 and 2021.

106.    Chirico understood that the proceeds from the Water Station Notes offering provided the funding for Creative's repurchase of his machines.  In an August 2022 payment schedule prepared in contemplation of the buyback of his water machines, Chirico recommended that the payment be funded through "available cash in the bond deal" (*i.e.*, Notes proceeds).

107.    Chirico did not disclose Creative's purchase of C3's water machines to the 352 Fund, to his supervisors, or to the Compliance Department.

108.    Additionally, in connection with the C3 buyout, Chirico secured Wear's agreement to issue a promissory note to C3 in which Wear personally agreed to pay C3 $1.9 million via equal installments on the first of every quarter starting January 1, 2023, with any remaining balance due on April 1, 2024 ("Promissory Note").

109.    The Promissory Note was in addition to the $7.3 million Chirico received from Creative for the repurchase of C3's water machines.

110.    In email correspondence and draft payment schedules in August and September 2022, Chirico described the additional amount reflected in the Promissory Note as compensation owed to him for "Outstanding Referral[s]" or a "referral balance."

111.    Wear paid down the Promissory Note in three installments of $316,666 each in January, April, and July 2023, and an additional payment of $800,000 in February 2024.  These payments were made to Chirico from Water Station's, Creative's, and another Wear entity's bank accounts.

112.    Chirico did not disclose to the 352 Fund, to his supervisors at Leucadia, or to the Compliance Department that he was owed $1.9 million from the founder and managing partner of the entity into which he had caused the 352 Fund to invest.

113.    In January 2023, while the Promissory Note was still outstanding, Water Station issued $25 million of additional Class A and B Notes under an Indenture supplement.

114.     Chirico directed the 352 Fund to purchase $3.3 million in additional Class B Notes under the supplemental Indenture, upsizing his client's investment in (and exposure to) Water Station.  Again, at this time, Chirico did not disclose to the 352 Fund, to his supervisors at Leucadia, or to the Compliance Department his continuing personal financial dealings with Water Station's owner.

115.     On March 7, 2023, the Leucadia COO asked Chirico over email to explain the nature of his disclosed Outside Business Activity, C3.  Chirico replied that C3 had been closed and currently conducted "zero" Outside Business Activity.

116.     This was misleading because Chirico did not inform the Leucadia COO that the reason C3 had closed was because Water Station had repurchased Chirico's water machines with Notes proceeds.  Nor did Chirico disclose that Water Station's owner owed him additional money on the Promissory Note, or that Chirico had received payments from Water Station under the Promissory Note.

117.     In the same March 7, 2023 email, the Leucadia COO asked whether C3's former business activity had anything to do with coin counting kiosks manufactured by a company ("Company A") in which the 352 Fund held an investment.

118.     At around the time of this inquiry to Chirico, the Leucadia COO had declined to approve a pre-clearance request from another member of Chirico's team to invest in Company A because it would have presented a conflict between that employee's interests and the 352 Fund's interests given the Fund's investment in Company A.  The Leucadia COO reported this request to Chirico, told Chirico that it was improper, and reminded Chirico that neither he nor his team could personally invest in companies that were also part of the portfolio.  This incident was the basis of the Leucadia COO's March 7, 2023, inquiry seeking to confirm whether Chirico's former Outside Business Activity likewise had anything to do with Company A.

119.    Chirico replied, in reference to C3's business activity:  "No, it was bottled water!"

120.    This response was misleading because Chirico concealed that this "bottled water" investment was actually an investment in water machines manufactured by Water Station, another company (like Company A) in which Chirico had invested the 352 Fund's assets.

121.    The Leucadia COO instructed Chirico to "let compliance know that the business has ceased operations."  Shortly thereafter, Chirico submitted an update to the Compliance Department stating that "the outside business activity within my portal has been closed as of Q4 2022.  The business is no longer in operation and may be removed from the file."

122.    In May 2023, Individual A told Chirico that he intended to loan Water Station $1.4 million to assist Wear in meeting obligations to earlier Water Station investors.

123.    Chirico provided a $700,000 loan to Individual A as part of this larger loan to Water Station.

124.    Chirico received $800,000 (his principal plus an additional $100,000) back from Individual A one month later, in June 2023, in satisfaction of the May 2023 loan, which Chirico understood reflected his share of the loan repayment from Water Station.

125.    Chirico also made an additional $750,000 in loans to Wear entities in the fall of 2023, on which he was paid back, by December 2023, a total of $815,000 (his principal plus $65,000 in interest).

126.    In total, Chirico loaned $1.45 million to Wear and/or Wear's entities in 2023.

127.    Chirico never disclosed these loans to the 352 Fund, to his supervisors at Leucadia, or to the Compliance Department.

## IV.    CHIRICO INCREASES THE 352 FUND'S EXPOSURE TO WATER STATION NOTES DESPITE RED FLAGS.

### A.    Chirico Discovers that Water Station Falsified Collateral for the Notes.

128.    In the summer of 2023, the Collateral Manager began to question the accuracy of the data reported by Water Station concerning the Notes' collateral.

129.    In or around August 2023, the Collateral Manager commissioned a third-party firm to perform spot checks of the water machines that were purportedly collateralizing the Notes.

130.    This firm determined that 163 of the 164 locations it visited had no Water Station water machines on site, a finding the Collateral Manager conveyed to Chirico and Wear by email on August 11, 2023.

131.    The Collateral Manager further determined that it could not locate or account for water machines associated with approximately 3,500 (out of the approximately 10,500) serial numbers for the machines purportedly securing the Notes.

132.    On August 16, 2023, the Collateral Manager informed Wear via email that Water Station had 90 days (a "Cure Period") per the terms of the Indenture to provide information verifying the existence and location of "3000+ machines" ostensibly securing the Notes that were "actually missing."  Chirico was copied on this email.

133.    On or around September 12, 2023, the Collateral Manager informed Chirico that Wear was not allowing it access to the vending management system Water Station used to track each of its water machines in real time, frustrating the Collateral Manager's efforts to locate the missing machines.

134.    The Collateral Manager also communicated to Chirico on multiple occasions during the Cure Period that Wear and Water Station were becoming increasingly delinquent in their financial reporting and their payment obligations under the Indenture.

135.    At the time, Chirico was also communicating with Wear about significant cash shortfalls Wear was experiencing and about how those cash flow issues were impairing Wear's ability to satisfy distribution payments owed to other Water Station investors.

136.    Aware of Wear's liquidity constraints, Chirico pressed Wear in emails and phone calls to prioritize payments to him and his spouse under the personal loans still outstanding to them, as well as to a select group of Water Station investors that Chirico and/or Individual A had referred.

137.    For example, on October 17, 2023, after learning that Wear had come into receipt of approximately $400,000 in loan proceeds to another of Wear's entities, Chirico wrote to Wear: "I would appreciate a payment to my wife and I of $100K" and directed Wear to pay an additional $270,000 to twelve of Chirico's investor referrals (including his brother).

138.    The same day, Wear paid Chirico and his spouse $100,000, as instructed.

139.    The Cure Period expired on November 29, 2023, without Wear providing any additional information about the missing water stations or curing the deficiencies of which he had been notified by the Collateral Manager.

140.    As of early December 2023, the Collateral Manager still had not located the water machines it had identified as missing over the prior summer and continued to seek information from Wear.  Chirico was copied on emails during this period between the Collateral Manager and Wear relating to these efforts and was thus aware that these issues remained unresolved.

141.    Under the Indenture, Water Station's failure to validate the existence and operability of the missing water machines identified by the Collateral Manager within the Cure Period should have required Water Station to refund the purchase price for those machines to the noteholders. However, Chirico did not take any steps to enforce this Indenture provision on behalf of the 352 Fund after the Cure Period expired.

**B.     Chirico Increases the 352 Fund's Exposure to Water Station Notes in the Face of These Red Flags.**

142.     Despite his knowledge of Wear's inability to explain the status—or even demonstrate the existence—of the water machines serving as collateral for the Water Station Notes, Chirico repeatedly caused the 352 Fund to increase its investments in the Notes.

143.     Institutional Investor A, which had purchased over $70 million of Class A Notes between April 2022 and January 2023, was not informed by the Collateral Manager about any potential issues with the Water Station Notes' collateral until December 2023, after the Cure Period had expired.

144.     Upon learning of the Collateral Manager's concerns about the Notes' collateral, Institutional Investor A agreed to sell the entirety of its position in the Class A Notes at a discount to par of 82 cents on the dollar.

145.     On December 15, 2023, Chirico directed the 352 Fund to purchase a significant portion of Institutional Investor A's Class A Notes at a discounted price for approximately $41.8 million, increasing the 352 Fund's holdings of Water Station Notes from $12.9 million to $54.7 million.

146.     Chirico directed that a Jefferies affiliate and a separately managed account he advised purchase of the remainder of Institutional Investor A's Class A Notes holdings at their offered discounted price.

147.     That same month, Chirico also authorized the 352 Fund to enter into another supplemental Indenture (the third), whereby the Fund agreed to loosen the restrictions on certain uses of funds by Water Station and gave Water Station the ability to substitute new collateral for collateral that was "non-performing" (*i.e.*, collateral that Wear could not demonstrate actually existed).

148.    On January 29, 2024, Chirico and Individual A participated in a phone call with Wear, which Chirico recorded.

149.    During the call, Chirico asked Wear if a substantial portion of the collateral for the Water Station Notes were actually other types of vending machines, such as snack vending machines, rather than water machines.  Individual A raised the possibility that a large portion of the water machines did not exist at all.

150.    Wear did not deny the allegations that that he had misrepresented the Notes collateral and provided no explanation as to the existence or whereabouts of the missing water machines.  Wear acknowledged that he did not know where the relevant water machines were and suggested instead that Wear would look for alternative funding sources to repay Water Station's investors.

151.    On the call, Individual A accused Wear of running "the largest franchise fraud in the history of the United States."

152.    Around the time of the call, Chirico also became aware of over a dozen pending or threatened lawsuits against Water Station and Wear by earlier investors in Water Station.  These lawsuits contained allegations that Water Station and Wear had failed to pay them required distributions and, in some cases, alleged that Wear was running a Ponzi scheme.

153.    Despite the foregoing, on February 1, 2024, Chirico directed the 352 Fund to purchase approximately $20.8 million in Water Station Notes (approximately $15.9 million of Class A Notes, and approximately $4.9 million of Class B Notes) from the Jefferies affiliate holding them.

154.    On February 2, 2024, Chirico caused the 352 Fund to enter into another supplemental Indenture (the fourth), under which the Fund acknowledged that "certain Issuer and/or Servicer covenant breaches, defaults, Events of Default have either occurred, or may occur . . . ." and agreed to waive those events of default by Water Station "now and in the future."

155.     Also pursuant to the February 2, 2024, supplemental Indenture, Chirico directed the 352 Fund to purchase an additional $12.7 million in Class A Notes from Water Station at a discount to par, and an additional $4 million in Class B Notes from Water Station at par, increasing the 352 Fund's total investment in Water Station's Notes to $92.2 million.

156.     On February 5, 2024, Chirico personally received a lump sum repayment of $800,000 from Wear to pay down the Promissory Note.

157.     Wear used the proceeds from the 352 Fund's purchase of Water Station Notes on February 2, 2024 to fund this payment.

158.     On February 14, 2024, Chirico authorized the fifth supplemental Indenture, which permitted Water Station to withdraw Notes proceeds without approval from the Collateral Manager or the 352 Fund.

159.     On February 16, 2024, Chirico authorized the release of all water machines and related agreements, revenues, and proceeds, from the lien of the Indenture, which left the Water Station Notes held by the 352 Fund entirely unsecured.

## V.     LEUCADIA ISSUES DEFAULT NOTICES AND TERMINATES CHIRICO.

160.     In the spring of 2024, Chirico informed Leucadia that a Water Station investor intended to file a complaint in federal court naming, among others, Chirico and Leucadia as defendants.

161.     After conducting an internal investigation, Leucadia terminated Chirico effective June 5, 2024.

162.     In May and June 2024, at the 352 Fund's direction, the trustee for the Water Station Notes issued notices of default to Water Station under the Indenture.

163.     The 352 Fund's valuation committee marked down the value of the Fund's holdings of Water Station Notes by 50% by June 2024.

164.    The 352 Fund has not collected any interest on its outstanding Water Station Notes since June 2024, nor has it recovered any of its principal investment.

165.    Leucadia is in the process of winding down the 352 Fund.

## FIRST CLAIM FOR RELIEF
### Violations of Advisers Act Sections 206(1) and (2)

166.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 165.

167.    At all relevant times, Chirico was an investment adviser under Advisers Act Section 202(a)(11) [15 U.S.C. § 80b-2(a)(11)].

168.    Chirico, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly has: (i) knowingly or recklessly employed one or more devices, schemes, or artifices to defraud any client or prospective client, and/or (ii) knowingly, recklessly, or negligently engaged in one or more transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon any client or prospective client.

169.    By reason of the foregoing, Chirico, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Advisers Act Sections 206(1) and (2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

## I.

Permanently enjoining Chirico and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Advisers Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b6-(2)].

**II.**

Ordering Chirico to disgorge all ill-gotten gains he received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations.

**III.**

Ordering Chirico to pay a civil monetary penalty pursuant to Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)];

**IV.**

Permanently enjoining Chirico from directly or indirectly acting as, or being associated with, any investment adviser, broker, or dealer.  For purposes of this paragraph, (i) a person is associated with an investment adviser if such person is a partner, officer, or director of such investment adviser (or performs similar functions), or directly or indirectly controls or is controlled by such investment adviser, including any employee of such investment advisor; and (ii) a person is associated with a broker or dealer if such person is a partner, officer, director, or branch manager of such broker or dealer (or occupies a similar status or performs similar functions), directly or indirectly controls, is controlled by, or is under common control with such broker or dealer, or is an employee of such broker or dealer; and

**V.**

Granting any other and further relief this Court may deem just and proper.

## JURY DEMAND

The Commission demands a trial by jury.


Dated:  New York, New York
        August 14, 2025

                                 /s/ David Zetlin-Jones
                              Lee A. Greenwood
                              David Zetlin-Jones
                              Heather L. Shaffer
                              Ming Ming Yang
                              Attorneys for Plaintiff
                              SECURITIES AND EXCHANGE COMMISSION
                              New York Regional Office
                              100 Pearl Street
                              Suite 20-100
                              New York, NY 10004-2616
                              (212) 336-0978 (Zetlin-Jones)
                              ZetlinJonesJ@sec.gov