UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHNAGE
COMMISSION,

               Plaintiff,

      – *against* –

JORDAN CHIRICO

              Defendant.

**OPINION & ORDER**

25-cv-6715 (ER)

RAMOS, D.J.:

The Securities and Exchange Commission (the "SEC"), brings this civil enforcement action against Jordan Chirico, alleging violations of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940. Concurrently, Chirco has been indicted on charges of investment advisor fraud and securities fraud in a related criminal proceeding in the Southern District of New York, *United States v. Jordan Chirico*, S1 25-cr-365 (JLR) (S.D.N.Y.) (the "Criminal Case"). Before the Court is a motion by nonparty the United States of America (the "Government") seeking to intervene and stay the civil action until the conclusion of the criminal case. Doc. 24. For the reasons set forth below, the Government's motion is GRANTED.

I.     **BACKGROUND**

     **A. Factual Background**

The parties agree that the factual allegations in this civil action substantially overlap with those in the related Criminal Case, and that both proceedings arise out of substantially the same underlying events. *See* Doc. 24 at 6; Doc. 26 at 7. Specifically, both matters concern an alleged $200 million fraud involving Water Station Management LLC ("Water Station" or the "Company"), which purported to manufacture and operate a nationwide network of water vending machines. *See* Doc. 24 at 6; Doc. 26 at 7.

On August 13, 2025, a federal grand jury sitting in the Southern District of New York returned two indictments arising from the alleged scheme. *See* Doc. 24 at 6.

In *United States v. Ryan Wear*, 25-cr-365 (JLR) (S.D.N.Y.) (the "Wear Indictment"), the Government charged Ryan Wear, the founder and operator of Water Station, with securities and wire fraud. *Id.* at 6. The Wear Indictment alleges that Wear operated Water Station as a Ponzi scheme by materially misrepresenting to investors that they were purchasing profitable water vending machines when, in fact, most of the machines did not exist. *Id.* Instead, Wear allegedly used funds from new investors to pay earlier investors and to finance personal expenditures. *Id.*

In *United States v. Jordan Chirico*, S1 25-cr-365 (JLR) (S.D.N.Y.) (the "Chirico Indictment"), the Government charged Jordan Chirico with investment adviser fraud and securities fraud. *Id.* at 7. The Chirico Indictment alleges that Chirico maintained significant undisclosed financial ties to Water Station and caused his clients to invest approximately $100 million in the Company. *Id.* It further alleges that Chirico concealed and mischaracterized his personal financial interests in Water Station and misled clients about the nature of the investment, despite "[knowing] that Water Station was a Ponzi scheme and that his investors' money was going to line his own pockets." *Id.*

Although the alleged fraudulent conduct is factually interrelated, the Government filed separate indictments within the same criminal case because it does not allege that that the defendants were co-conspirators in each other's respective schemes. *Id.* at 7 n.1.

On August 14, 2025, the SEC commenced this civil enforcement action against Chirico. Doc. 1. The complaint alleges that Chirico breached his fiduciary duty while serving as a portfolio manager for 3 | 5 | 2 Capital ABS Master Fund, LP (the "352 Fund" or the "Fund"). *Id.* ¶ 1. Specifically, the SEC alleges that Chirico was an "investment advisor" within the meaning of Section 202(a)(11) of the Investment Advisers Act, 15 U.S.C. § 80b-2(a)(11), and that he engaged in fraudulent or deceptive practices in

2

violation of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-6(1), (2). *Id.* ¶¶ 167, 168, 169.

Leucadia Asset Management LLC ("Leucadia") is a registered investment adviser and a wholly owned subsidiary of Jefferies Financial Group Inc. *Id.* ¶ 16. In 2021, Leucadia established the 352 Fund, a hedge fund focused on asset-backed securities and loans, which operated within Leucadia's 3 | 5 | 2 Capital Division (the "352 Capital Division"). *Id.* ¶ 17. As of December 31, 2023, the 352 Capital Division had approximately $641 million in assets under management. *Id.*

The complaint alleges that, from 2018 through 2021, Chirico personally invested more than $7 million in water vending machines purportedly sold and serviced by Water Station or its affiliates. *Id.* ¶ 2. According to the SEC, Chirico received nearly $3 million dollars in distributions and approximately $1.5 million in "referral fees" for recommending friends, family members, and business associates to invest in the Company. *Id.* The Government contends that unlike other investors who ultimately lost everything, Chirico exited "with a tidy profit." Doc. 24 at 8.

Beginning in late 2021, the Complaint alleges that Chirico worked with Wear to coordinate the issuance and sale of notes purportedly collateralized by water vending machines (the "Water Station Notes" or "Notes"). Doc. 1 ¶ 3. Upon the first issuance of the Notes in April 2022, Chirico allegedly directed the 352 Fund to invest nearly $9 million in the Notes. *Id.* And between April 2022 and February 2024, Chirco allegedly increased the Fund's position to more than $90 million. *Id.*

According to the SEC, during this period Chirico failed to disclose to Leucadia or the 352 Fund that he had a significant personal investment in Water Station, that he had arranged for a Wear-controlled entity to purchase his water machine investments using proceeds from the Notes offering, or that he had entered into and extended millions of dollars in loans and promissory notes owed to him by Wear and Water Station. *Id.* ¶¶ 3,

3

4. The Government similarly contends that "Chirico used his investors' money to bail out his personal investment … leaving the investors with the risk". Doc. 24 at 8–9.

By at least the fall of 2023, Chirico was alleged to have been on notice of multiple red flags concerning Water Station. Doc. 1 ¶ 5. In particular, the SEC alleges that the "Collateral Manager," an independent financial firm tasked with monitoring the performance of the assets backing the Water Station Notes, informed Chirico that Water Station's representations "regarding the number and existence of the water machines purportedly securing the Notes appeared inaccurate." *Id.* The SEC also contends that Chirico had become aware that Water Station was facing liquidity issues creating a risk that it might be unable to meet its repayment obligations. *Id.*

Rather than alert investors, the Government alleges that Chirico, who was still owed more than $1 million by Wear and Water Station, insisted that Wear and Water Station prioritize repaying him before other creditors, including the 352 Fund. Doc. 24 at 9. According to the Government, in January 2024 Wear admitted to Chirico that he had misappropriated tens of millions of dollars in bond proceeds and that thousands of water machines supposedly collateralizing the Notes did not exist. *Id.*

Despite these alleged warning signs, Chirico allegedly increased the 352 Fund's investment in the Notes from approximately $12.9 million in August 2023 to more than $90 million by February 2024, while continuing to conceal his personal financial entanglements with Wear and Water Station. Doc. 1 ¶ 6. The SEC further alleges that even as the 352 Fund was increasing its exposure, Chirico was pressuring Wear to use available funds to make payments to him and to investors he had referred, thereby reducing the cash available to satisfy Water Station's obligations to the Fund investors. *Id.*

Wear eventually failed to raise more funds. Doc. 24 at 9. In August 2024, Water Station was put into receivership and forced into involuntary Chapter 11 bankruptcy.

Doc. 1 ¶ 7. As of the date of the indictment, it is alleged that investors have lost over $200 million. Doc. 24 at 9.

### B. Procedural Background

The grand jury returned the Chirico and Wear Indictments on August 13, 2025. *See* Doc. 24 at 6.

The SEC commenced the parallel civil enforcement action against Chirico the following day, on August 14, 2025. Doc. 1. The SEC separately filed a complaint against Wear, Water Station, and Creative Technologies, Inc. ("Creative"), alleging, *inter alia*, violations of Section 17(a) of the Securities Act of 1933, and Section 10(b) of the Securities Exchange Act of 1934, as well as Rule 10b-5 thereunder. *SEC v. Wear*, 25-cv-6713 (ER) (S.D.N.Y.), Dkt. ("Wear Civ. Dkt") 1.

On October 1, 2025, the Government moved to intervene in the SEC's civil action against Wear and to stay discovery pending the criminal case against Wear. Wear Civ. Dkt. 14. No party opposed the motion, and the Court allowed the Government to intervene and granted the stay on October 2, 2025. *Id.*

On January 16, 2026, the Government filed a motion to intervene in the instant civil action against Chirico and for a stay pending resolution of the parallel Criminal Case. Doc. 24. The Government argues that a stay is warranted because the Criminal Case arises from the same underlying facts, creating a substantial risk that civil discovery could be used to circumvent the more limited discovery available in criminal proceedings. *Id.* at 5. The Government further contends that allowing civil discovery to proceed would provide little efficiency because the outcome of the Criminal Case would likely have estoppel effect. *Id.* Finally, the Government asserts that courts in this Circuit routinely stay civil proceedings when parallel criminal prosecutions involve "overlapping defendants and facts." *Id.*

On February 6, 2026, Chirico filed a brief in opposition. Doc. 26. Chirico does not oppose the Government's motion to intervene. *Id.* at 10 n.7. He does, however, oppose the Government's request for a complete stay of the proceedings. *Id.*

On February 13, 2026, the Government filed a reply in further support of their motion. Doc. 28.[1]

## II.    DISCUSSION

The Government moves to intervene in this action and seeks to stay all further discovery pending resolution of the related Criminal Case. Doc. 24. It contends that permitting discovery to proceed in this civil action would create "a risk of significant interference with the Criminal Case." *Id.* at 11. In particular, the Government argues that permitting civil discovery to move forward would result in asymmetrical discovery where Chirico could avail himself of the broader discovery rules available in civil litigation to circumvent the more limited discovery rules applicable in criminal proceeding, while the SEC would be deprived of reciprocal discovery because Chirico is likely to invoke his Fifth Amendment privilege against self-incrimination. *Id.* at 5. It also contends that permitting civil discovery would yield no efficiencies because "the Criminal Case is likely to have estoppel effect." *Id.* And that a stay, therefore, "would preserve the Court's resources." *Id.* at 11. The SEC has submitted a letter supporting the Government's request for a stay. Doc. 25.

---

[1] In addition to the two federal civil enforcement actions brought by the SEC, several private civil actions have been filed in state courts and are ongoing. Certain Water Station investors, including Jefferies and the 352 Fund, filed a civil action in the Commercial Division of the New York Supreme Court against Wear, Chirico, and others in *352 Capital GP LLC v. Ryan Wear*, Index No. 653486/2025 (N.Y. Sup. Ct.). On February 9, 2026, that court ordered a stay of all depositions pending resolution of the Criminal Case. *See* Doc. 28 at 4. Two additional related actions are pending in state court: *352 Capital GP LLC v. First Fed Bank*, No. 25-2-17253-8 (Wash. Super. Ct.) in the state of Washington, and *Indiana Public Retirement System v. Jefferies Financial Group*, No. 29D05-2510-CE-012191 (Ind. Super. Ct.) in Indiana. The Government represents that it has conferred with the parties in those matters and understands that no depositions have been scheduled, nor are any expected to be scheduled, before resolution of the Criminal Case. Doc. 28 at 4. The Government further represents that some of the defendants in the Indiana action have moved to stay the proceedings pending resolution of the Criminal Case. *Id.*

Chirico does not oppose the Government's request to intervene. Doc. 26 at 10 n.7. He does oppose a complete stay of the case, arguing that a stay of "indefinite duration" would be inappropriate. *Id.* at 6. Rather than a complete stay, Chirico proposes what he characterizes as a "compromise solution," namely, a more limited stay of discovery that would apply to certain depositions, specifically those involving witnesses with a facial Fifth Amendment privilege, like himself. *Id.*

Prior to the filing of the instant motion, the Government, the SEC, and Chirico reached an agreement regarding the scope of non-deposition discovery. *See* Doc. 24 at 11; Doc. 26 at 9–10. As part of that agreement, the Government agreed to modify the protective order in the Criminal Case to permit Chirico to use materials produced in criminal discovery in the various civil actions brought against him. *See* Doc. 24 at 11; Doc 26 at 10 n. 6. The Government represents that it has produced, or made available for production, more than 3.5 million documents in the Criminal Case, and that it has completed its production of Rule 16 materials. Doc 24 at 10, 16. Accordingly, the parties' dispute is narrowly focused on the scope of deposition discovery. *See Id.* at 11; Doc 26 at 10.

### A. Motion to Intervene

Rule 24(a)(2) of the Federal Rules of Civil Procedure provides for intervention as of right where the movant "claims an interest relating to the property or transaction this is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest." Fed. R. Civ. P 24(a)(2). Rule 24(b)(1)(B) of the Federal Rules of Civil Procedure provides for permissive intervention where the movant "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). In exercising its discretion under Rule 24(b), a court "must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

Consistent with the prevailing practice in this District, the Government is entitled to intervene under Rule 24(a) and will be permitted to intervene under Rule 24(b), for the limited purpose of seeking a stay. *See e.g.*, *SEC v. Javice*, No. 23-cv-2795 (LJL), 2023 WL 4073797, at *3 (S.D.N.Y. Jun. 20, 2023); *SEC v. Treadway*, No. 04-cv-3464 (VM) (JCF), 2005 WL 713826, at *2 (S.D.N.Y. Mar. 30, 2005). "It is well-established that the United States Attorney may intervene in a federal civil action to seek a stay of discovery when there is a parallel criminal proceeding, which is anticipated or already underway, that involves common questions of law or fact." *SEC v. Downe*, No. 92-cv-4092 (PKL), 1993 WL 22126, at *11 (S.D.N.Y. Jan. 26, 1993). Indeed, the Second Circuit has recognized that the Government has "a discernible interest in intervening in order to prevent discovery in the civil case from being used to circumvent the more limited scope of discovery in the criminal matter." *SEC v. Chestman*, 861 F.2d 49, 50 (2d Cir. 1988).

Given the substantial overlap of legal and factual issues between this action and the parallel criminal proceeding, and the absence of any opposition by Chirico, the motion to intervene is GRANTED.

### B.  Motion to Stay

#### 1.  Legal Standard

A court possesses inherent authority to stay proceedings as part of its power to manage its docket. As the Supreme Court has explained, "the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254 (1936).

A stay of civil discovery during the pendency of a criminal action has been characterized as an "extraordinary remedy." *Trustees of Plumbers and Pipefitters National Pension Fund v. Transworld Mechanical, Inc.*, 886 F. Supp. 1134, 1139 (S.D.N.Y. 1995). Nevertheless, it is well established that a court has the discretionary authority to do so when the interests of justice so require. *See e.g.*, *Kashi v. Gratsos*, 790

F.2d 1050, 1057 (2d Cir. 1986).  In particular, "[a] district court may stay civil proceedings when related criminal proceedings are imminent or pending, and it will sometimes be prudential to do so." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 98 (2d Cir. 2012).  In making this determination, courts in this District commonly consider six factors:

> (1) the extent to which the issues in the criminal case overlap with those presented in the civil case; (2) the status of the case, including whether the defendants have been indicted; (3) the private interests of the plaintiffs in proceeding expeditiously weighed against the prejudice to plaintiffs caused by the delay; (4) the private interests of and burden on the defendants; (5) the interests of the courts; and (6) the public interest.

*Id.* at 99 (quoting *Trustees of Plumbers and Pipefitters National Pension Fund*, 886 F. Supp. at 1139).  These factors, however, "can do no more than act as a rough guide for the district court as it exercises its discretion."  *Id.*  The party seeking the stay "bears the burden of establishing its need."  *Id.* at 97 (quoting *Clinton v. Jones*, 520 U.S. 681, 708 (1997)).

    a.  *Factual Overlap*

At the threshold, the Court's inquiry considers the extent to which the civil and criminal issues overlap.  *See Volmar Distributors, Inc. v. New York Post Co., Inc.*, 152 F.R.D. 36, 39 (S.D.N.Y. 1993) (citation omitted).  Here, the parties do not dispute that this case and the Criminal Case are premised on substantially the same alleged conduct. *See* Doc. 24 at 6; Doc. 26 at 7.

Accordingly, this factor weighs in favor of granting a stay.

    b.  *Status of the Criminal Case*

The second factor considers the status of the parallel criminal proceeding.  "A stay of a civil case is most appropriate where a party to the civil case has already been indicted for the same conduct."  *Trustees of Plumbers and Pipefitters National Pension Fund*, 886 F. Supp. at 1139.  This is because, once a criminal indictment has been returned, a defendant faces a heightened risk of self-incrimination.  *Id.*  And, because the

criminal process is underway, any resulting delay in the civil proceedings is unlikely to be prolonged, thereby reducing the potential prejudice to the opposing party from a stay. *See e.g.*, *SEC v. Abraaj Investment Management Limited*, No. 19-cv-3244 (AJN), 2019 WL 6498282, at \*2 (S.D.N.Y. Dec. 3, 2019); *In re Par Pharmaceutical, Inc. Securities Litigation*, 133 F.R.D. 12, 13 (S.D.N.Y. 1990).

Here, Chirco was indicted one day before the filing of this civil action. *See* Doc. 24 at 6. The parallel criminal proceeding is therefore already in progress.

Chirico contends that a stay is unwarranted because no trial date has been set, citing "the breadth and depth of discovery issues flagged by the defense." Doc 26 at 19. He asserts, therefore, that "neither the parties nor this Court can predict with certainty when the criminal case will ultimately be tried." *Id.* at 20.

At the January 21, 2026 status conference in the Criminal Case, however, the court addressed these issues and, while fully aware of the ongoing discovery disputes, indicated that trial would likely not be delayed for more than a year. *See* Doc. 28 at 3.

Notwithstanding these representations, Chirico asserts that a stay would prolong this case for a "lengthy, if not indeterminate, period." Doc. 26 at 20. However, courts in this District have routinely found delays of several months to be reasonable where a criminal trial is pending. *See SEC v. Garelick*, No. 23-cv-5567 (PGG), 2023 WL 8602840, at \*3 (S.D.N.Y. Dec. 12, 2023) (finding that "a stay would not unduly delay the instant case" where the criminal trial date was four months away); *SEC v. Blaszczak*, No. 17-cv-3919 (AJN), 2018 WL 301091, at \*2 (S.D.N.Y. Jan. 3, 2018) (finding that a four-and-half-month delay between the stay and the expected criminal trial date was "not . . . an unreasonable amount of time"); *Trustees of Plumbers and Pipefitters National Pension Fund*, 886 F. Supp. at 1140 (finding that a parallel criminal trial scheduled within six months "would not unreasonably prolong" the civil action). Chirico has not identified a single case in which a delay was deemed unreasonable. Indeed, courts in this District have not defined a precise outer boundary for what constitutes an unreasonable delay, and

the Court need not do so here.  Trial in the Criminal Case is expected to begin within six to nine months, which the Court finds does not unreasonably prolong this civil action.

Chirico also argues that "this case only remains in early stages because of the government's motion to stay it."  Doc. 26 at 20.  The Court finds this argument to be without merit.  Chirico cannot rely on the very delay caused by the requested stay to claim that the case has not progressed.  Further, he notes that the parties agreed, and the Court granted, an extension allowing Chirico to respond to the complaint within thirty days of the Court's decision on this motion.  *Id.* at 20.  Absent that extension, the response would have been due on December 22, 2025.  *Id.*  Chirico speculates that had a motion to dismiss been filed, it would have been fully briefed by now, and that were an answer filed, the parties would be "deep in fact discovery."  *Id.* at 20–21.  While that may be true, Chirico overlooks that he himself requested the extension.  *See* Doc. 20.  Having sought and obtained that relief, he cannot now rely on the resulting delay to bolster his argument.

Because Chirico has already been indicted and a stay will not unreasonably delay the civil proceedings, this factor weighs in favor of a stay.

c.  *The Plaintiff's Interest*

In most cases, the SEC takes no position on the Government's request to stay a related civil case, and courts accordingly treat this factor as neutral.  *See e.g.*, *SEC v. Calabrigo*, No. 22-cv-3096 (LJL), 2022 WL 4752427, at *5 (S.D.N.Y. Sept. 30, 2022); *Blaszczak*, 2018 WL 301091, at *2.  Here, however, the SEC affirmatively supports the Government's motion to stay.  *See* Doc. 25.

In its letter, the SEC explained that its civil action against Wear has already been stayed by consent of the parties.  *Id.* at 1. The SEC asserts that, given the substantial factual overlap between the two civil actions, discovery will involve many of the same witnesses and documents.  *Id.* at 2.  According to the SEC, therefore, staying this action

will facilitate coordination of civil discovery between the two civil cases, which would minimize inconvenience to third parties and promote judicial economy. *Id.*

Because the SEC affirmatively supports a stay, this factor weighs in favor of granting the requested relief.

### d. The Defendant's Interest

The fourth factor considers the private interests of, and burden imposed on, the defendant. In particular, courts weigh the competing pressures a defendant faces when a civil action proceeds alongside a criminal action. On the one hand, a defendant may be forced to choose between "making potentially incriminating admissions during discovery or asserting their Fifth Amendment rights, on the basis of which the civil jury can draw an adverse inference." *Treadway*, 2005 WL 713826, at *4. On the other hand, the mere pendency of a civil action may impose a significant "economic burden" and cast "a cloud" over a defendant's professional and personal life. *Id.* at *3. For that reason, courts in this District recognize that a defendant has a legitimate interest in resolving such allegations "in a timely manner—not just when it is most convenient for the government." *Blaszczak*, 2018 WL 301091, at *2.

Chirico asserts that the parallel civil and criminal actions have caused him "serious financial and reputational harm" and that "his name is mud in his industry." Doc. 26 at 16. He maintains that he "wishes to clear [his name] in both cases" and that, to do so, he "needs to 'obtain [the] ordinary discovery' that he is entitled to as a civil defendant." *Id.* (quoting *SEC v. Oakford Corp.*, 181 F.R.D. 269, 272–73 (S.D.N.Y. 1998)).

Chirico does not, however, explain how staying deposition discovery in this action would meaningfully delay or impede his ability to defend himself or otherwise clear his name. Even under his proposed "compromise solution," all depositions of individuals who possess a facial Fifth Amendment privilege would be stayed until the conclusion of the Criminal Case. *See id.* at 6. And because the individuals whose

conduct lies at the center of the SEC's allegations would likely not be deposed until after the Criminal Case concludes, Chirco's proposal would itself undercut the prospect of an expeditious resolution of the SEC's claims here. *See Garelick*, 2023 WL 8602840, at *4 (observing that where "the individuals whose conduct is central to the SEC's claims," including the individual defendants and the government's witnesses, are likely to assert their Fifth Amendment rights, thereby "making an expeditious resolution of the SEC's allegations . . . extremely unlikely at this stage.") (internal quotations omitted). Thus, even under his proposed stay, this action will be delayed until the resolution of the Criminal Case. *See Abraaj Investment Management Limited*, 2019 WL 6498282, at *2 (observing that where a defendant proposed staying only his own deposition until after the parallel criminal case, "resolution of [the civil] case would be delayed regardless of whether the [c]ourt grants a full stay").

The Court is sympathetic to Chirco's desire to resolve the allegations against him and restore his reputation. But he has not demonstrated that proceeding with limited deposition discovery would meaningfully advance that goal.

Chirco further contends that the Government and SEC "made a choice to charge these cases" simultaneously, "and it is a choice from which they greatly benefitted." Doc. 26 at 12. He argues that the Government "cannot pursue a strategy that allows them to take advantage of the benefits of dual prosecutions, but then complain when the defendants, too, find ways to benefit from … having to defend on two fronts at the same time." *Id.* at 12–13 (quoting *SEC v. Kanodia*, 153 F. Supp. 3d 478, 484 (D. Mass. 2015)).

Certainly, Chirco may well derive benefit in the Criminal Case if civil discovery is permitted to proceed. Nonetheless, the law does not recognize a defendant's interest in leveraging civil discovery to aid a parallel criminal proceeding. *See Javice*, 2023 WL 4073797, at *6. And because any tools available through civil discovery would not be available absent this civil enforcement action, a stay leaves Chirco in the same position as any other defendant in a criminal action. *See id.*

Accordingly, this factor is neutral.

e. *The Interest of the Courts*

The fifth factor considers the interest of the court. In evaluating their own interests, courts share an interest in the efficient resolution of the instant action. *See In re Worldcom, Inc. Securities Litigation*, No. 02-cv-3288 (DLC), 2002 WL 31729501, at *8 (S.D.N.Y. Dec. 5, 2002). A stay promotes judicial efficiency, as courts in this District have repeatedly recognized that a parallel civil case is "likely to benefit to some extent from the [c]riminal [c]ase no matter its outcome." *SEC v. One or More Unknow Purchasers of Securities of Global Industries, Ltd.*, 11-cv-6500 (RA), 2012 WL 5505738, at *4 (S.D.N.Y. Nov. 9, 2012). This is because a related criminal case may resolve factual issues common to the civil case, thereby narrowing the issues that remain for adjudication. *See Blaszczak*, 2018 WL 301091, at *3; *c.f. SEC v. Contorinis*, No. 09-cv-1043 (RJS), 2012 WL 512626, at *3 (S.D.N.Y. Feb. 3, 2012) (noting that "[c]ourts in [the Southern District of New York] have consistently found that a defendant convicted of securities fraud in a criminal proceeding is collaterally estopped from relitigating the underlying facts in a subsequent civil proceeding"). And if Chirico is acquitted in the Criminal Case, the transcripts from the criminal proceedings will be available to the civil parties and may facilitate and streamline later civil discovery. *See Rosenthal v. Giuliani*, No. 98-cv-8408 (SWK), 2001 WL 121944, at *2 (S.D.N.Y Feb. 9, 2001). Additionally, evidence gathered during the criminal prosecution may likewise be used in this civil action. *See Trustees of Plumbers and Pipefitters National Pension Fund*, 886 F. Supp. at 1140.

Chirco argues that the Government's efficiency concerns "ring hollow" because the Government and the SEC "have brought different charges." Doc. 26 at 21. The Court

14

is unpersuaded. Both proceedings allege violations of the Investment Advisers Act, and the Criminal Case additionally charges Chirico with securities fraud. [2]

Given the substantial overlap between the factual issues and the likelihood that the criminal proceedings will streamline this civil case, the Court's interest in judicial efficiency weighs in favor of staying the civil proceedings pending resolution of the Criminal Case.

Accordingly, this factor supports granting a stay.

### f. The Public Interest

The sixth factor considers the public interest. That interest is advanced both by the Government bringing a criminal prosecution and by the SEC pursuing a civil enforcement action. Courts in this Circuit have recognized that "[t]he public's interest in the effective enforcement of the criminal law is the paramount public concern." *SEC v. Carroll*, No. 19-cv-7199 (AT), 2020 WL 1272287, at *4 (S.D.N.Y. Mar. 17, 2020) (internal quotations and citation omitted). Consistent with that principle, "the public's interest in the integrity of the [parallel] criminal case is entitled to precedence over the civil litigant." *Id.* (internal quotations and citation omitted); *see also SEC v. Archer*, No. 16-cv-3505 (WHP), 2016 WL 4371303, at *2 (S.D.N.Y. Aug. 10, 2016) (noting that the public has an "overriding interest in the integrity of criminal proceedings"). Protecting that interest necessarily includes ensuring that civil discovery is not used to circumvent the more limited discovery available in criminal proceedings. *See Blaszczak*, 2018 WL 301091, at *3 (quoting *Treadway*, 2005 WL 713826, at *4). Those constraints on

---

[2] Notably, collateral estoppel does not require that the civil claims arise under the same statutory provisions as the criminal conviction. It is enough that "the factual allegations underlying the … convictions are sufficient to establish that [the defendant] also violated the provisions [of law] at issue." *SEC v. Dimensional Entertainment Corp.*, 493 F. Supp. 1270, 1277 (S.D.N.Y. 1980); s*ee also Gelb v. Royal Globe Insurance Co.*, 798 F.2d 38, 43 (2d Cir. 1986) (noting that "[t]he criminal defendant is barred from relitigating any issue determined adversely to him in the criminal proceeding, provided that he had a full and fair opportunity to litigate the issue"); *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 332 (1979) (finding that offensive collateral estoppel is appropriate where a party "had every incentive to litigate . . . fully and vigorously").

criminal discovery reflect deliberate policy judgments about the appropriate scope and timing of disclosure in criminal cases. *See United States v. Percevault*, 490 F.2d 126, 129 (2d Cir. 1974) (noting that the Jencks Act, 18 U.S.C. § 3500, "represents a legislative determination that access to a witness' statements could be useful in impeaching a witness but was not intended to be utilized in preparation for trial").

According to the Government, allowing civil deposition discovery to proceed would result in "asymmetrical discovery," whereby permitting Chirico to depose "relevant witnesses" while the SEC would be unable to depose Chirco due to "his likely assertion of Fifth Amendments rights." *Id.* at 20. This, the Government contends, "is both unfair and a circumvention of the criminal discovery rules that govern when criminal defendants are entitled to obtain prior statements of the Government's trial witnesses," thereby enabling Chirico to obtain discovery beyond what the criminal rules permit. *Id.* at 20–21; *See* 18 U.S.C. § 3500(b) (requiring that prior statements of Government witnesses be made available only after the witnesses have testified on direct examination). The Government maintains those concerns even under Chirico's alternative proposal. Doc. 28 at 12–13.

Chirico responds that the Government's concerns are "overblown" and reflect "entirely foreseeable consequences of the choice the [G]overnment and the SEC made" in pursuing parallel civil and criminal actions. Doc. 26 at 11–12. He emphasizes that the Government and the SEC "closely coordinated … in bringing simultaneous civil and criminal actions" and therefore should not be "relieved of the consequences that will flow if the two actions proceed simultaneously." *Id.* at 12 (quoting *SEC v. Saad*, 229 F.R.D. 90, 91 (S.D.N.Y. 2005)). Chirico further asserts that the SEC could have avoided these concerns altogether by waiting until the conclusion of the Criminal Case before filing its civil enforcement action. *Id.* He also maintains that he "is unaware of any legal requirement entitling the government to preserve its cooperators from examination before trial." *Id.* at 13 (quoting *SEC v. Chakrapani*, No. 9-cv-1043 (RJS), 2010 WL 2605819, at

16

*11 (S.D.N.Y. June 29, 2010)). Moreover, Chirico argues that the Government has offered "no evidence whatsoever that Mr. Chirico has any intention to circumvent the Jencks Act, manufacture inconsistencies, or intimidate witnesses." *Id.* at 17. He contends that the Government's motion is motivated solely by "a desire to maintain a tactical advantage." *Id.* at 14 (quoting *Oakford Corp.*, 181 F.R.D. at 272–73).

The Court finds Chirico's arguments unpersuasive. Chirico's position largely ignores the rationale underlying the limitations on criminal discovery. Congress imposed those limitations "to protect the integrity of the criminal justice process by deterring efforts to tailor testimony, suborn perjury, fabricate evidence, and intimidate witnesses." *Garelick*, 2023 WL 8602840, at *6. Allowing civil deposition discovery to proceed in parallel would risk undermining these protections.

Chirico's proposed "compromise solution" does not cure these concerns. His proposal—staying the depositions of individuals with a facial Fifth Amendment privilege, such as himself and Wear, while simultaneously requiring other witnesses, including the alleged victims, to appear for depositions—would heighten, rather than mitigate, the risk of end-running the criminal discovery rules. Further, courts in this District have rejected similar proposals. *See Garelick*, 2023 WL 8602840, at *5 (granting a full stay, rather than the defendant's proposed stay, which would have allowed discovery to proceed while staying only depositions of defendants and any government witness "who may . . . assert Fifth Amendment rights"); *see also Calabrigo*, 2022 WL 4752427, at *5–6; *Abraaj Investment Management Limited*, 2019 WL 6498282, at *2.

Contrary to Chirico's assertion, the Government is not required to substantiate its concerns about the circumvention of the criminal discovery rules with specific facts. Courts in this District have consistently recognized the risk of circumvention inherent in parallel discovery and have granted stays on that basis. *See, e.g.*, *Blaszczak*, 2018 WL 301091, at *4 (finding that a specific showing that a defendant is "unusually likely" to engage in misconduct is "not necessary to conclude that the public's interest in witness

17

security and integrity favors a stay"); *see also Abraaj Investment Management Limited*, 2019 WL 6498282, at *3; *Treadway*, 2005 WL 713826, at *4 (finding that the public interest favors a stay where a defendant "could certainly" use civil discovery to obtain an unfair advantage in a parallel criminal proceeding, even absent specific evidence that the defendant was likely to do so). More to the point, the Government's concerns about tailored testimony and perjury are not merely hypothetical. In its reply, the Government represents that, over the course of its investigation, Chirico exhibited a pattern of "shifting narratives." Doc. 28 at 8. Specifically, the Government asserts that when confronted with a document inconsistent with his prior account, Chirico would "proffer a new set of facts shaped around the contours of that document." *Id.*

Finally, the Court rejects Chirico's suggestion that the SEC could have obviated these concerns by simply delaying the filing of this civil action. Although the Government and the SEC may have conducted parallel investigations alongside, or even together with, each other and filed their respective actions one day apart, they remain distinct governmental entities entitled to operate independently. In any event, in light of the substantial body of case law in this District holding that, where parallel cases brought by the Government and the SEC, courts consistently grant stays of civil actions pending resolution of the criminal proceeding, even over a defendant's objection. *See, e.g.*, *Garelick*, 2023 WL 8602840; *Javice*, 2023 WL 4073797; *Calabrigo*, 2022 WL 4752427; *Blaszczak*, 2018 WL 301091.

Accordingly, this factor supports granting a stay.

## III.   CONCLUSION

For the forgoing reasons, the Government's motion to intervene and motion to stay this case are GRANTED. This case will be stayed in its entirety pending completion

of the parallel Criminal Case.  The Clerk of the Cout is respectfully directed to terminate the motions, Docs. 24 and 27, and stay the case.

It is SO ORDERED.

Dated:    April 10, 2026
          New York, New York

_____
EDGARDO RAMOS, U.S.D.J.